# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

**United States of America**

      *Plaintiff,*

**v.**                     Case No. 3:09-cr-010
                            Judge Thomas M. Rose

**Ryan Cofer,**

      *Defendant.*

---

### ENTRY AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS. (DOC. 9).

---

Pending before the Court is Defendant Ryan Cofer's Motion to Suppress. Doc. 9. On January 27, 2009, Defendant Ryan Cofer was charged with one count of Receipt of Child Pornography in violation of 18 U.S.C. § 2252(a)(2) and one count of Possession of Child Pornography in violation of 18 U.S.C. § 2252(a)(4)(B). On March 16, 2009, Defendant filed the motion under review, which seeks to suppress: (1) all evidence seized from his computer taken from the residence of 4522 Croftshire Drive, Kettering, Ohio and all derivative evidence subsequently obtained; (2) all that was seized from the residence; and (3) any statements attributed to or made by Cofer.

A suppression hearing was held on May 27, 2009. On June 30, 2009, Defendant filed his post-hearing memorandum. On July 27, 2009, the Government filed a post-hearing memorandum in response.

**Background**

On October 3, 2007, Defendant Ryan Cofer was released from prison and began a five-year term of probation with the Montgomery County Adult Probation Department subsequent to a conviction for a sex crime. That same day he met for the first time with his "intensive" probation officer, Christopher S. Jantonio (Transcript of Suppression Hearing, May 27, 2009 [hereinafter Tr.] at 6-10). Jantonio met with Cofer to familiarize him with his conditions of supervision, and the rules and regulations he was required to follow as a probationer. (Tr. at 10).

One condition of Cofer's release was that "[he] shall be subject to searches as follows: During the period of [his] supervision authorized Probation Officers who are engaged within the scope of their supervisory duties or responsibilities may search, with or without a warrant, the person of the offender, the place of residence of the offender,...if the Probation Officers have reasonable grounds to believe that the offender is not abiding by the law or otherwise is not complying with the conditions of the offender's supervision or other suspension." (G.E. 3)(Tr. at 14-15). Other conditions established by means of the case plan objectives for Cofer included that he not be drinking alcohol and that he was to undertake treatment for sex offenders. (Tr. at 73, 75-77). Finally, included among the Special Conditions for Sex Offenders is condition number 11, which states "I will not be in possession of any sexually oriented materials, including pornographic pictures, magazines, video tapes, DVD movies or sexual toys." (Tr. at 17)(G.E. 4). Cofer was familiar with all of these conditions and case plan objectives.

On February 26, 2008, Jantonio and his partner, Robyn Hunter conducted a home visit at Cofer's residence at 4522 Croftshire Drive, in Kettering, Ohio. (Tr. 18, 84). A "home visit" is part of the routine duties of an intensive probation officer, allowing the officer to "verify that [the

probationer is] residing where they indicate [and] that they reside as they are required to per the registration requirements that are set up for sex offenders . . . A home visit is also used to make sure that the defendant is in compliance with the rules and terms of their supervision [both the general conditions and special conditions for sex offenders]." (Tr. at 19, 50, 85). The Ohio Office of Probation policy calls for a home visit every 60 days for each probationer. (Tr. at 19). Supervisors of sex offenders conducting home visits routinely inquire as to whether or not the offender has sexually oriented materials in their possession. (Tr. at 76).

On February 26, 2008, Cofer had been living at the 4522 Croftshire Drive address for approximately one month when officers Jantonio and Hunter made their first visit to the Croftshire Drive residence, where Cofer is the sole resident. (Tr. at 19, 86, 97). The officers knocked on Cofer's front door, after which Cofer answered the door. (Tr. at 22). Before entering Cofer's residence, while standing at the open door, Jantonio noticed a Sports Illustrated swimsuit edition calendar that had pictures of women in revealing swimsuits hanging on the wall. (Tr. at 22, 27). Jantonio reminded Cofer that he shouldn't be in possession of the swimsuit edition calendar because he was in sex offender treatment. (Tr. at 26, 89).

Cofer let the officers into the residence. (Tr. at 22). Upon entering the residence and glancing toward the kitchen area 10-15 feet from the door, Jantonio noticed a 1.5 liter bottle of liquor "out in the open." (Tr. at 22-23). Jantonio then noticed that there was another bottle of liquor on top of the refrigerator, which still had liquid in it. (Tr. at 23). Prior to this visit, Cofer had reported to Jantonio's office on numerous occasions under the influence of alcohol. (Tr. at 25). As a result, Jantonio instructed him not to drink alcohol. (Tr. at 25). Further, at the time of the home visit, Cofer was under treatment for "chemical dependency issues which involved alcohol." (Tr. at

25). Jantonio then asked Cofer to dump out the contents of the bottle in the sink, and Cofer complied. (Tr. at 23). When asked, Cofer told the officers that he had a 12-pack of beer in the refrigerator, and the officers instructed him to pour all the been down the sink as well, which he did. (Tr. at 26, 89-90).

Jantonio then "specifically asked him if he was in possession of any sexually oriented materials or pornographic pictures or anything [in] that regard that would be a violation of his supervision." (Tr. at 27, 90). Cofer replied that there was an issue of Playboy magazine in the bathroom. (Tr. at 90). Jantonio found the Playboy magazine, and showed it to Cofer, who acknowledged that it was his. (Tr. at 29).

After confiscating the Playboy magazine, Jantonio asked Cofer if he was in possession of anything further that was sexually oriented, and Cofer indicated that there was. (Tr. at 30, 91). Cofer told the officers that he had a picture of a naked female on his dresser in his bedroom. (Tr. at 30, 91). Jantonio went into the bedroom and retrieved the framed picture, and after advising Cofer that the picture was inappropriate and removing the picture from its frame, Jantonio confiscated the picture as contraband. (Tr. at 30, 91). Officer Hunter described the picture as an unclothed female, provocatively posed with her breasts and vaginal area exposed. (Tr. at 31, 92-94). Both officers testified that they considered the picture to be sexually oriented material. (Tr. at 31, 94). At this point in the visit, the officers had taken the Sports Illustrated Swimsuit Edition calendar off the wall as well as the Playboy magazine and the picture from Cofer's dresser, and had placed all the materials face down on the table and their plan was to confiscate the materials. (Tr. at 95).

Jantonio testified that he believed that, "at that point [he] had reasonable grounds to believe that Cofer was in violation of the terms of his supervision and that he was found [to be] in

possession of sexually oriented material." (Tr. at 32). Officer Hunter agreed that in her experience there was reason to believe that Cofer was not complying with the conditions of his supervision. (Tr. at 95). Jantonio advised Cofer that he was going to search further. (Tr. at 115).

Jantonio then began a search of Cofer's residence. (Tr. at 31-32, 95) Jantonio first looked in Cofer's bedroom, where he lifted the mattress off the top of the box spring and observed thirteen 3 ½ " computer disks in between the mattress and the box spring. (Tr. at 32). He pulled the disks out from between the mattress and box spring, and was concerned to read that one of the disks was labeled "Lil Amber." (Tr. at 33) The name "Lil Amber" concerned him because "it kind of made [him] feel that that disk might be of a child." *Id*. He also observed a disk labeled "Billy"which caused him similar concern. *Id*. Jantonio gathered the 13 disks and showed them to Cofer, who, when asked, indicated he knew nothing about them, and denied that they were his. (Tr. at 34, 97). Both Jantonio and Officer Hunter had concerns about the content of the disks, so Jantonio contacted his supervisor, who advised the officers to confiscate the disks. (Tr. at 34-35).

Officers Jantonio and Hunter both knew that the 3 ½" disks were computer storage devices. (Tr. at 35, 97). There was a computer with a compatible floppy disk drive in Cofer's bedroom, which was set up on two big plastic boxes. (Tr. at 36). Jantonio asked Cofer if the computer worked, and he replied that it did not. (Tr. at 38, 98). When Jantonio turned the computer on, however, it appeared to be working. (Tr. at 38-39, 99-100). The officers did not have the search program that they typically use to search for contraband images on computers, so having found no contraband on the computer, they were advised by their supervisor not to confiscate the computer. (Tr. at 39,100). Jantonio also found a second Sports Illustrated swimsuit calendar underneath the cushion of a chair in Cofer's bedroom. (Tr. at 42).

All told, the officers confiscated: the two swimsuit calendars; the Playboy magazine from the bathroom; the photograph from Cofer's dresser; and the 13 floppy disks that were found between the mattress and box spring of Cofer's bed. (Tr. at 42-43)

At the end of the home visit, the officers, who had reported to the sheriff's office upon their arrival, noted the end time of their visit and reported it to the sheriff's office as well. Both officers estimated that the visit took approximately 30-35 minutes. (Tr. at 41, 102).

In accordance with office policy, Jantonio gave the floppy disks to Joseph Pickay, the manager of the Management Information System, so that he could look at the floppy disks to see if there was any child pornography on the disks. (Tr. at 44-46). Shortly thereafter, Joseph Pickay returned the disks to Jantonio and told him that the very first disk he reviewed contained child pornography. (Tr. at 45-46). Officer Jantoino then filled out a property form and submitted the disks to the property room. (Tr. at 47).

On June 13th, 2008 the officers obtained and executed a Federal Search Warrant for Ryan Cofer's residence. (Tr. at 4 11-14). The Government stipulates, however, that nothing was found on the computer that was seized in the execution of the warrant.

**Analysis**

Defendant seeks to suppress the items seized from his apartment during the officer's home visit, as well as all fruits thereof. The starting point for the relevant analysis has recently been stated by the Sixth Circuit:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The question here is one of reasonableness, as the

warrant and probable cause requirements generally do not apply to searches of parolees, probationers or their residences. See *Samson v. California*, 547 U.S. 843, 857 (2006) (permitting suspicionless searches of parolees); *United States v. Knights*, 534 U.S. 112, 118, 121 (2001) (upholding a warrantless search of a probationer's apartment based on reasonable suspicion and a probation condition requiring him to submit to a search at any time). That means we must consider "the degree to which [the search] intrudes upon an individual's privacy" as well as "the degree to which it is needed for the promotion of legitimate governmental interests." *Samson*, 547 U.S. at 848 (internal quotation marks omitted); see also *Virginia v. Moore*, – U.S. – , 128 S.Ct. 1598, 1604 (2008).

One factor central to this balancing inquiry is an individual's status on the "privacy continuum." *Wilson v. Collins*, 517 F.3d 421, 425 n. 2 (6th Cir. 2008) (internal quotation marks omitted); see also *Samson*, 547 U.S. at 850. At one end of the continuum are free citizens, who enjoy "absolute liberty." *Knights*, 534 U.S. at 119, 122 S.Ct. 587 (internal quotation marks omitted); see also *Wilson*, 517 F.3d at 425 n. 2. Probationers have fewer expectations of privacy than free citizens, see *Knights*, 534 U.S. at 119, and parolees have still "fewer expectations of privacy than probationers," *Samson*, 547 U.S. at 850. At the other end of the spectrum are inmates, who have no legitimate expectation of privacy from searches of their prison cells. See *Hudson v. Palmer*, 468 U.S. 517, 525-26 (1984).

*United States v. Smith*, 526 F.3d 306, 308-09 (6th Cir. 2008).

As regards probationers like Defendant in the instant case,

[T]he search of [a] probationer's home conducted by a law enforcement official aware of the condition[is] reasonable, not under the special needs doctrine, but in light of the Court's "general Fourth Amendment approach of examining the 'totality of the circumstances' with the probation search condition being a salient circumstance." *Id.* at 118 (internal citation omitted). [In *Knights* t]he Court ruled that the balance of the factors relevant in the totality of the circumstances analysis–the probationer's reduced expectation of privacy and the competing governmental interest in monitoring probationers–[leads] to the conclusion that reasonable suspicion [is] sufficient to conduct a search of a probationer's home. *Id.* at 121. Thus, under *Knights*, "[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the

>    probationer's significantly diminished privacy interests is reasonable." *Id.* at 121.

*United States v. Herndon*, 501 F.3d 683, 688 (6th Cir. 2007).

Reasonable suspicion "is based on the totality of the circumstances and has been defined as requiring articulable reasons and a particularized and objective basis for suspecting the particular person ... of criminal activity." *United States v. Henry*, 429 F.3d 603, 609-10 (6th Cir. 2005). Reasonable suspicion requires "more than an ill-defined hunch." *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004). It must be based on "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). A court must consider the totality of the circumstances when determining whether an officer had reasonable suspicion of criminal activity. *Id.*; *United States v. Knox*, 839 F.2d 285, 289 (6th Cir. 1988). The evidence offered in support of reasonable suspicion is viewed using a common sense approach. *Richardson*, 385 F.3d at 630. "Courts analyzing searches under the reasonable suspicion standard use the same factors but require a less demanding showing than when applying a probable cause standard." *United States v. Payne*, 181 F.3d 781, 790 (6th Cir. 1999). In evaluating the existence of reasonable suspicion, it is recognized that Officers are "allowed to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' *United States v. Arvizu*, 534 U.S. 266, 274 (2002), quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981).

Applying this standard to the instant case, the officers obtained reasonable suspicion for searching in places such as inside Defendant's refrigerator and underneath Defendant's mattresses and cushions based upon what they observed in the course of their home visit.

The Court initially notes that As part of their supervisory duties, Ohio probation officers routinely conduct home visits. (Tr. at 19, 50, 85) The Court agrees with those who have recognized that "Home visits . . . are routine and appropriate elements of supervising a convicted person serving a term of supervised release," and "because a home visit is far less intrusive than a probation search, probation officers conducting a home visit are not subject to the reasonable suspicion standard applicable to probation searches under *Knights*." *United States v. Reyes*, 283 F. 3d 446 (2d Cir. 2002); *United States v. Rea*, 678 F.2d 382 (2d Cir. 1982)(approving supervisory visits); *United States v. Workman*, 585 F. 2d. 1205 (4th Cir. 1978)("[i]nherent in the probation officer's duty to 'use all suitable methods . . to aid probationers and to bring about improvements in their conduct and condition' is authority to visit the probationer"); see also *United States v. LeBlanc*, 490 F.3d 361 (5th Cir. 2007)(home visit, unlike home search, does not require reasonable suspicion); *United States v. Massey*, 461 F.3d 177 (2d Cir. 2006)(warrantless routine home visit lawful); *Soroka v. Montana*, 598 P. 2d 1095 (1983)(approving home visit at 6:30 a.m. to determine if defendant was harboring juveniles overnight); *Louisiana v. Malone*, 403 So.2d 1234 (1981)(approving routine home visit). The home visit being an appropriate supervisory action, Defendant's statements inteh course of thereof and what was observed in plain view are admissible evidence.

The propriety of the home visit recognized the Court turns its attention to the search that took place during the course of the visit. Prior to initiating the search of Cofer's residence on February 26, 2008, the Officers could articulate the following facts:

1. Defendant was prohibited from possessing any controlled substances or drugs of abuse. Further, Defendant was required to accomplish all case plan objectives set for him by his probation officer. One case plan objective in place at the time of the home visit was that he was not to be drinking [alcohol]. He was also supposed to be engaged in sex offender treatment.

2. Defendant's special conditions of supervision for sex offenders specifically prohibited him from possessing any sexually oriented materials, including pornographic pictures, magazines, video tapes, DVD movies or sexual toys.

3. Defendant had bottles of alcohol on the counter of his kitchen and on top of his refrigerator. Jantonio had previously told Defendant not to drink alcohol. He reminded Defendant of the restriction and instructed Defendant to pour the alcohol down the sink, which Defendant did without protest.

4. Defendant admitted that he was in possession of sexually oriented materials, and told Jantonio where to find a Playboy magazine and a graphic photograph of a naked woman in a sexually explicit pose on Defendant's dresser.

Just as the officers had reasonable suspicion to look in the refrigerator for more alcohol once they observed alcohol about the kitchen, so they also had reasonable suspicion to search Defendant's bedroom, including under his mattress once Defendant admitted the possession of sexually oriented materials and the officers had observed such materials about the house and in his bedroom.

Because the officers were in the course of legitimate duties in performing the house visit and because their observations during the house visit provided reasonable suspicion for the search that was performed, Defendant's Motion to Suppress, Doc. 9, is **DENIED**.

**DONE** and **ORDERED** in Dayton, Ohio, this Wednesday, August 26, 2009.

s/Thomas M. Rose
_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE